UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

J.R.J. ENTERPRISES, INC.,

                    Plaintiff,                    10 Civ. 6496

     -against-                                    OPINION

M/V DUNCAN ISLAND, her engines, boilers,
etc., ECUADORIAN LINE, INC. d/b/a
EDUADORIAN LINE, A Service of SOUTH
PACIFIC SHIPPING CO., LTD., and SOUTH
PACIFIC SHIPPING CO. LTD.,

                    Defendants.

------------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          PURRINGTON & MCCONNELL
          82 Wall Street
          New York, NY  10005
          By:  John Hay McConnell, Esq.

          Attorneys for Defendants

          LYONS & FLOOD, LLP
          65 West 36th Street, 7th Floor
          New York, NY  10018
          By:  Edward P. Flood, Esq.
               Michael A. Namikas, Esq.

**Sweet, D.J.**

Defendants South Pacific Shipping Co. Ltd. ("South Pacific") and Ecuadorian Line, Inc. ("Ecuadorian Line") (collectively, the "Defendants") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint of Plaintiff J.R.J. Enterprises, Inc. ("JRJ" or the "Plaintiff") and to award freight costs on its counterclaim.  Based on the facts and conclusions set forth below, the motion is granted, and the complaint will be dismissed.

## I. **Prior Proceedings**

On September 1, 2010, JRJ filed a complaint pursuant to Rule 9(h) of the Federal Rules of Civil Procedure alleging a maritime claim arising out of the Defendants' negligence in properly maintaining the temperature of a shipment of mangoes at all times, up to the point of receipt of the cargo.  JRJ filed its amended complaint on October 1, 2010 and the instant motion was heard and marked fully submitted on January 25, 2012.

1

## II.  **The Facts**

The facts are set forth in the Defendants' Rule 56.1
Statement of Material Facts in support of their motion,
supporting affidavits and the opposition affidavit of Jimmy
Machuca ("Machuca"), the owner and President of JRJ, and are not
in dispute except as noted below.

JRJ is a New Jersey-based fruit importer and the owner
of the shipment of mangoes that is the subject of this action.
Ecuadorian Lines is the United States agent for South Pacific,
an ocean cargo carrier.  JRJ, South Pacific and shipper
Inverhispec, S.A. ("Inverhispec") entered into a contract for a
delivery of 5,280 boxes of mangoes from Guayaquil, Ecuador to
New York City aboard the M/V Duncan Island, the vessel upon
which the mangoes were transported.

South Pacific issued bill of lading number SOPH
021087163012.  The bill of lading specified that the goods were
to be transported inside Container number TRLU1735717, a sealed
refrigerated container with its reefer unit set at eight degrees
Celsius.  On November 13, 2009, Inverhispec boxed and loaded the
mangoes into the container, which was clean, dry and free of

2

odors.  The container was then sealed and placed in the
Defendants' custody.  On board the M/V Duncan Island, the
Defendants set the container's reefer unit to eight degrees
Celsius, as per Inverhispec's instructions, a temperature
appropriate for shipments of mangoes.

According to the recorded temperature data, apart from
minor temperature variations during the loading aboard the
vessel, the temperature inside the refrigerated container was
maintained at approximately eight degrees Celsius throughout the
Defendants' care and custody of the shipment.

On November 22, 2009, the container arrived in New
York and was discharged by the Defendants to U.S. Customs for
inspection.  Following the inspection, the container was picked
up by JRJ's agents on November 24, 2009 and delivered to JRJ's
buyer's warehouse in the Bronx, New York.

According to Machuca, upon inspection on November 25,
2009, some of the mangoes were marked by brown and black
discoloration spots.  Such discoloration is typical of chilling
damage from storing mangoes at temperatures below eight degrees
Celsius or the failure to hot wash them prior to loading.  JRJ,

3

however, did not survey the cargo, properly document the alleged damage, or notify the Defendants at that time.

Clause 16 of the bill of lading provides, in pertinent part, that:

> Notice of loss or damage or any other claim of whatsoever description and its general nature must be given in writing to the Carrier or its agent at the port of discharge or place of delivery before or at the time of the removal of the goods into the custody of the person entitled to delivery. If the loss or damage is not apparent, the written notice must be given within three days of the delivery.

The box of mangoes remained inside JRJ's refrigerated storage room for the next eight days. No records have been produced evidencing the temperature inside this room during this period.

On December 2, 2009, JRJ requested a U.S. Department of Agriculture ("USDA") inspection of the cargo, which took place on December 2 and 3, 2009. The USDA inspector issued an inspection certificate memorializing his observations. He noted that a portion of the mangoes had "brown/ black discoloration" and exhibited sunken or discolored areas.

4

The terms and conditions of payment are included in Clause 12 of the bill of lading, and provides that:

> Full freight to the named port of discharge or place of delivery and other charges . . . shall be completely earned on receipt of the goods by the Carrier, whether prepaid or collect, and the Carrier shall be entitled to all freight and charges, and any expenses incurred in respect of the goods, whether actually paid or not, and to receive and retain them under all circumstances . . . .

On November 20, 2009, JRJ issued a check to Ecuadorian Lines in the amount of $4,886.00 for the freight charges of the subject shipment.  The check was subsequently dishonored due to lack of funds in the Plaintiff's account and the freight charges for the shipment remains unpaid.

## III. **The Summary Judgment Standard**

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient

5

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

        "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995).   Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case.  When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). In considering a summary judgment motion, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation

marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538
(1986).  However, "the non-moving party may not rely simply on
conclusory allegations or speculation to avoid summary judgment,
but instead must offer evidence to show that its version of
events is not wholly fanciful."  Morris v. Lindau, 196 F.3d 102,
109 (2d Cir. 1999) (internal quotation marks omitted).

        When deciding a motion for summary judgment, a court
must remain mindful of the fact that summary judgment is "an
extreme remedy, cutting off the rights of the non-moving party
to present a case to the jury."  H & M Hennes & Mauritz v.
Skanska USA Bldg., Inc., 617 F. Supp. 2d 152, 155 (E.D.N.Y.
2008).

## IV.  Discussion

        Jurisdiction over this matter is proper pursuant to 28
U.S.C. § 1331(1) because the alleged damages occurred on
navigable waters and arise from traditional maritime activity.
See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,
513 U.S. 527, 534, 115 S. Ct. 1043, 130 L.Ed.2d 1024 (1995).
Further, the Carriage of Goods by Sea Act, 46 U.S.C. § 30701

("COGSA"), governs this dispute as one between a carrier and a shipper, and as provided for in the bill of lading.  Under COGSA, the plaintiff has the burden of proving that "the goods were damaged while in the carrier's custody."  Caemint Food, Inc. v. Brasiliero, 647 F.2d 347, 351 (2d Cir. 1981).  In order to make out its prima facie case, a plaintiff must prove both "delivery of goods to the carrier in good condition, and outturn by the carrier in damaged condition."  Id. at 352 (citing Vana Trading Co. v. S.S. Mette Skou, 556 F.2d 100, 104 (2d. Cir. 1997)).  Some courts recognize that a plaintiff may satisfy the delivery in good condition requirement "by proving that the nature of the damage occurred while the cargo was in the carrier's custody."  Hershey Foods Corp. v. Waterman Steamship Corp., No. 82-0533(DNE), 1994 WL 281929, at *3 (S.D.N.Y. 1994) (citing Kanematsu-Gosho Ltd. v. M/V Messiniaki Aigli, 814 F.2d 115, 118 (2d Cir. 1987)).  Once the plaintiff makes such a showing, the burden shifts to the carrier to show that one of the statutory exemptions to liability exists.  Bally, Inc. v. M.V. Zim America, 22 F.3d 65, 69 (2d Cir. 1994); J.R.J. Enters., Inc. v. M/V CCNI Cartagena, No. 08-3473(GBD), 2010 WL 5538516, at *3 (S.D.N.Y. Dec. 29, 2010).

**Condition on Delivery to Carrier**

Although a clean bill of lading ordinarily constitutes prima facie evidence that the cargo was in good condition at the time of shipment, this is not the case where the ocean carrier had no opportunity to inspect the goods. See, e.g., Bally, Inc., 22 F.3d at 69; J.R.J. Enters., Inc. v. M/V Cap Ortegal, No. 07-6457(LAP), 2009 WL 1704273, at *4 (S.D.N.Y. Mar. 31, 2009); Junior Gallery v. Neptune Orient Lines, No. 94-4518(DC), 1998 WL 770558, at *5 (S.D.N.Y. Nov. 3, 1998). "[C]ourts have long recognized that [a clean bill of lading] does not have this probative force where . . . [the plaintiff] seeks to recover for damage to goods shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded." Caemint Food, Inc., 647 F.2d at 352. Thus, where the shipper delivers a sealed container to the ocean carrier, a plaintiff will have to produce evidence beyond the bill of lading to show that the cargo was in good order at loading. M/V Cap Ortegal, 2009 WL 1704273, at *3.

Here, the Defendants had no opportunity to inspect the pre-shipment condition of the mangoes. Because the container was sealed and the Defendants were unable to observe the mangoes

9

at loading, the Plaintiff's burden of producing evidence
demonstrating that the shipment was in good order is appropriate
and strict.  Consequently, the Plaintiff cannot rely solely upon
the clean bill of lading to make its prima facie case, and must
proffer evidence demonstrating that the cargo was in good
condition when it was loaded into the container.

        The Plaintiff has failed to respond to the Defendants'
discovery requests and produced insufficient evidence relating
to the pre-shipment condition of the mangoes.  The Plaintiff
maintains that the USDA Foreign Site Certificate of Inspection
issued at Guayaquil is demonstrative of good order prior to
delivery.  There is no evidence, however, that the USDA
inspector performed any quality inspections at the time of
loading.  With the exception of a "Hot Water Treated" stamp,
there are no notations or descriptions concerning the quality or
condition of the mangoes on the certificate.  Without more, the
evidence offered by the Plaintiff fails to demonstrate that the
mangoes were in good condition at loading as a matter of law.
See, e.g., Sam Jin World Trading, Inc. v. M/V Cap San Nicolas,
No. 09-3997(LMM), 2010 WL 2670847 (S.D.N.Y. July 2, 2010)
(holding plaintiff had not made out its prima facie case under
analogous facts).  The Plaintiff has therefore failed to prove

10

that the delivery of goods to the carrier were in good
condition.

**Condition at Outturn**

The Plaintiff similarly fails to satisfy the second
prong of its burden proving outturn by the carrier in damaged
condition.  The sealed container was first opened on November
25, 2009 in the presence of Machuca and his long-time buyer
"Roberto" of Gold Latino.  Machuca contends that, upon
inspection, the mangoes exhibited black spots, which are
customarily caused by cold temperatures during ocean transit.
In his affidavit, Machuca stated that he recorded pulp
temperatures of 4.4 degrees Celsius (40 degrees Fahrenheit) and
took at photograph of the damage he observed.  There is no
evidence, however, documenting that the pulp temperatures of the
mangoes were measured or that a USDA inspection was requested at
that time.  The produced photograph is also not date stamped nor
exhibits any indication of when the photograph was taken.

Moreover, when Machuca was deposed in June, 2012, he
claimed that he never took the mangoes' pulp temperature nor
confirmed when he photographed the spotted mangoes.

11

Q.   But why didn't you contact an independent, private surveyor?

A.   I didn't do that.

Q.   Why not?

A.   I just didn't do it.

Q.   I mean, you've been in business how many years? 20 years?

A.   Yes.

Q.   And you've mentioned about seven or eight lawsuits you've had –

A.   Right.

Q.   With ocean carriers.

A.   Right, right, right.

Q.   Why didn't you protect yourself to get a surveyor to come and look at and inspect the cargo?

A.   I just didn't do.

Q.   You didn't do it? I mean, it's important to verify the condition of the cargo at that point, right?

A.   Yes. You're right.

Q.   All right. Did you take any types of temperature readings of this cargo at that point? Do you have any documents – Well first of all, did you take or did you make any attempt to take any temperature readings for the cargo?

A.   Well, USDA did.

Q.   Yeah, but USDA came many days later, correct?

A.   Yes. Because it was Thanksgiving weekend.

12

JRJ subsequently stored the mangoes inside a refrigerated storage room for eight days after their delivery. The Plaintiff has submitted no evidence regarding the temperatures inside this room during the relevant period.

On December 2, 2009, JRJ notified the Defendants and contacted the USDA to request an inspection.  The USDA Inspection Certificate recorded low pulp temperatures, brown and black discoloration and sunken areas in the mangoes.  The Plaintiff maintains that these defects were caused by the Defendants' negligence during delivery.  However, Captain Vinay K. Dewan ("Dewan"), a marine surveyor who regularly inspects allegedly damaged cargo, opined that the defects observed by the USDA were caused by excessively cold temperatures inside the storage room at JRJ's warehouse over the eight day period. According to Dewan, the recorded pulp temperatures were too low for the safe storage of mangoes and the discoloration was consistent with chilling damage.

In addition, the Plaintiff has produced no credible evidence to support the allegation that the container's reefer

13

unit malfunctioned.   The evidence demonstrates that South Pacific properly maintained the container's requested temperature of eight degrees Celsius throughout transit. Dewan's review of the temperature records confirmed that "the reefer unit was properly working and that the records were not tampered with or altered".   There is no evidence that the subject container's temperature records have been tampered with, and as Machuca testified at his deposition:

> Q:   And if the temperature records are accurate and the temperature inside the container was kept at 8 Celsius, then the ocean carrier would have done anything wrong here; is that correct?
>
> [Plaintiff's Counsel]:   If they were accurate.
>
> Q.   If they were accurate.
>
> A.   If they were accurate, correct.   If they did their job.
>
> Q:   Okay.   Other than the temperature, do you have any other complaints about what the carrier did in regard to this shipment?
>
> A:   No, no other complaints.

Machuca's contradictions in his affidavit, the undated photograph and the Plaintiff's unsubstantiated claims are insufficient to show outturn by the carrier in damaged condition and overcome COGSA's presumption of good order.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (stating court

14

must grant motion for summary judgment where opposing party's evidence in opposition merely colorable, conclusory, speculative, or not significantly probative); Wurtzel v. Starbucks Coffee Co., 257 F. Supp. 2d 520, 525 (E.D.N.Y. 2003) (holding opposing party cannot rely upon speculation or conjecture in opposing motion for summary judgment); Austracan (U.S.A.), Inc. v. Neptune Orient Lines, Ltd., 612 F. Supp. 578, 585-86 (S.D.N.Y. 1985) (giving no credence to definitions given in a self-serving testimony).  Thus, without additional evidence, the Plaintiff fails to prove outturn by the carrier in damaged condition.

In addition, the Plaintiff failed to notify the Defendants as required by COGSA and Clause 16 of the contract of carriage.  A plaintiff who fails to give notice of cargo loss or damage within three days of receipt is burdened by a presumption of delivery in good order under COGSA.  See 46 App. U.S.C. § 1303(6); see also Asoma Corp. v. M/V Land, 46 Fed. Appx. 34, 36 (2d Cir. 2002) (upholding the presumption of arrival in good condition, where plaintiff did not give notice until a month after receipt of the goods); Ferrostaal v. M/V Sea Baisen, No. 02-1900(RJH), 2005 A.M.C. 1831, 1835 (S.D.N.Y. May 10, 2005) (holding apparent damage requires "immediate notice" to the

carrier under COGSA).  Accordingly, there is a presumption of good order under COGSA.  46 U.S.C. § 30701.

## Plaintiffs Reliance on the Nature of the Damage of the Cargo

Alternatively, the Plaintiff relies on Transatlantic Marine Claims Agency v. M/V OOCL Inspiration, 137 F.3d 94 (2d Cir. 1998) and C. Itoh & Co. v. Hellenic Lines, 470 F. Supp. 594 (S.D.N.Y. 1979), to argue that "the condition of the goods at delivery or outturn can nonetheless show, by the nature of the damage, that the injury complained of happened to the cargo while it was in the carrier's custody."  Transatlantic Marine, 137 F.3d at 97; Hershey Foods, 1994 WL 281929, at *3.  While that may be true in cases where the damage clearly occurred in the carrier's custody, where the nature of the damage is unclear, the Plaintiff cannot rely upon this line of cases to prove good order.

In Transatlantic Marine, the Second Circuit upheld this court's ruling in favor of the plaintiff because the seawater wetting damage "was of the sort that inexorably justified the conclusion that the injury occurred at sea." Transatlantic Marine, 137 F.3d at 99.  A carrier may also be

16

liable even in the absence of direct proof that the cargo was in good condition upon delivery if "there is evidence that the packaging of an item of cargo was damaged in a particular way while in the custody of the carrier, and corresponding damage to the cargo itself is discovered upon removal of the packaging." Asoma Corp. v. M/V Land, No. 01-1000(JCF), 2002 WL 202170, at *11 (S.D.N.Y. Feb. 7, 2002), aff'd, 46 Fed. Appx. 34 (2d Cir. 2002).

        In C. Itoh, the plaintiff produced ample proof indicating that the cargo's damage could have only been caused while in the defendants' custody.  The evidence included the ship's log reporting daily rainfall, notes from the delivery book, and several survey reports indicating the degrees of wet stains and mildew damage from the fresh-water wetting.  C. Itoh, 470 F. Supp. at 597-98.  The shipment was also packaged in corrugated cardboard cartons that exposed it to weather conditions during the voyage and, unlike here, afforded the carrier the opportunity to view the contents before loading. Id.  JRJ's shipment was in a sealed container that was temperature controlled and monitored throughout its voyage, with no signs of tampering.  There is no credible evidence indicating

17

that the damage to the mangoes was caused during the Defendant's custody.

Courts in this district have also rejected unsubstantiated allegations of fruit damages by plaintiffs and claims of carrier negligence under analogous facts.  In M/V CCNI Cartagena, the plaintiff argued that its plantains shipment displayed chilling damage upon delivery.  2010 WL 5538516 at *3-4.  The court rejected the plaintiff's claims, finding that the cargo was loaded in a sealed container and temperature records demonstrated that the carrier properly cared for the shipment throughout the voyage.  Id. at *3.  Similarly, in M/V Cap Ortegal, the court exonerated a carrier based on refrigeration records proving that the temperature was properly maintained within the recommended range throughout the voyage.  2009 WL 1704273 at *4.

In addition, the Plaintiff stored the mangoes in a storage unit for eight days and did not record the temperature during that period.  While both parties agree that the fruit damage is typical of chilling, it is unclear that the damage occurred while in the carrier's custody or in JRJ's buyer's warehouse.  In fact, Dewan's expert opinion suggests the latter.

18

Accordingly, the Plaintiff has not discharged its burden of making out a prima facie case under COGSA.

## The Plaintiff Has Not Met The Fault Or Privity Of The Defendants

Even assuming the Plaintiff makes its prima facie case, under COGSA's statutory exceptions, an ocean carrier is not liable for cargo loss or damage if "neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." 46 U.S.C. § 30701; see also Sunpride (Cape) (PTY) Ltd. v. Mediterranean Shipping Co., S.A., No. 01-3493(CSH), 2003 WL 22682268, at *33 (S.D.N.Y. Nov. 12, 2003).

Here, as the bill of lading makes clear, the Defendants' responsibility was to fulfill Inverhispec's request that the container's internal temperature be maintained at eight degrees Celsius. All records demonstrate that the Defendants complied with this instruction. Thus, no acts or omissions of the Defendants or their agents have been established to cause the cargo damage observed by the USDA on December 2 and 3, 2009.

## Breach of Contract Counterclaim

19

In its Answer, South Pacific asserted a counterclaim for unpaid freight arising out of the ocean carriage of the shipment.  The bill of lading reflects freight charges in the total amount of $4,886.00.  South Pacific now moves for summary judgment to recover the unpaid amount.

South Pacific's counterclaim for unpaid freight has not been contested in any way by the Plaintiff.  The Plaintiff presents no valid defenses to the counterclaim and admitted its debt to South Pacific in a deposition.  Accordingly, the motion for summary judgment on South Pacific's counterclaim for freight charges in the amount of $4,886.00, plus interest and costs is granted.

**Conclusion**

Based on the facts and conclusions set forth above, the Defendants' motion for summary judgment is granted to dismiss JRJ's claims against the Defendants with prejudice. Judgment is entered in favor of South Pacific against JRJ with respect to South Pacific's counterclaim.

20

It is so ordered.


New York, NY
April 23, 2012

ROBERT W. SWEET